UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:21-CR-118 |
| v. | ) | |
| | ) | JUDGE JORDAN |
| NELSON PAUL REPLOGLE | ) | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through undersigned counsel, respectfully submits its sentencing recommendations with respect to the defendant, Nelson Paul Replogle. For the reasons discussed herein, the Government recommends that the defendant receive a sentence of imprisonment within the applicable Guideline range of 87 to 108 months.

### STATEMENT OF FACT

Based on outward appearance, Nelson Replogle seems like a person unlikely to engage in any illegal activity, much less a crime of violence. For 26 years he taught social studies and history in Middleville, Michigan. He was regarded as an excellent teacher – well-liked by his students – and also coached football and baseball. He and his wife Ann Replogle, a retired second grade teacher, had been married for 33 years. Together they raised two children that they adopted at birth. Approximately three years ago, the Replogles retired from teaching and moved to Knoxville, following a carefully formulated retirement plan. In April, 2021, they were enjoying a life that could only be described as ordinary. Nelson Replogle was 59 years old. He had no

debt, history of drug abuse, or criminal history. Unbeknownst to Ann Replogle, however, her husband had been living a secret life and was planning to have her killed.

### 1. *The Investigation*

On April 20, 2021, the Knoxville office of the FBI received information from a confidential source that an unknown person had paid the equivalent of $17,853.49 USD in Bitcoin to arrange for the murder of Ann Replogle through a dark web Internet service. The source provided the FBI with identifying information for the Bitcoin wallet and told investigators that the payment had been made on April 15, 2021.

The Global Operation and Targeting Unit at FBI Headquarters conducted a chain analysis and found that the Bitcoin payments had originated from multiple Coinbase wallets.[1] The FBI then sent legal process to Coinbase and requested exigent circumstances assistance in identifying the user associated with the wallets. Coinbase identified the user as Nelson Replogle.

Both Nelson and Ann Replogle were interviewed by the FBI on April 20, 2021. Although the defendant denied any knowledge of a plot to kill his wife, certain facts materialized during the investigation that irrefutably pointed to him as the culprit.

---

[1] Coinbase is a cryptocurrency exchange platform that is operated by Coinbase Global, Inc., through which customers can receive or spend various forms of cryptocurrency, including Bitcoin. A cryptocurrency "wallet" stores the public and private "keys" that are required for transactions.

2

The confidential source shared with the FBI the following instructions for how the murder was to be accomplished, which the source had obtained through its own investigation:

```
A Boniface S Apr 04 18:32 L Apr 15 19:30 T C B 1BUFzzUDwTkTUtzBipjWjnM3pdTixg2E87 0.2925 BTC X

Name Ann Replogle Address                           Country: United States Send 0.1425 Bitcoin

Description: Would like it to be a road rage or car jacking gone wrong. Don't take the target out at home. Not before Monday 4/19/2021 Subject Order has been updated Dec 31 16:33 Message: Hello , Your order has been updated and the information has been saved. Looking forward to hear from you Admin Internet Killers Reply Del

Subject Order has been updated Dec 31 16:33 Message: Hello , Your order has been updated and the information has been saved. Looking forward to hear from you Admin Internet Killers Reply Del

Subject Ann Replogle Dec 31 16:33 Message: Will be on road from address to Tazwell Pike Animal clinic sometime between 8:15 and 9:00 a.m. on Tuesday 4/20/2021. Vehicle is a maroon Honda CRV.
```

The instructions for Ann Replogle's murder provided her street address[2] and a description of her car. In addition, they contained information that only the defendant or his wife would have known: During Ann Replogle's April 20 interview, the FBI learned that she had planned to take the family dog to a veterinary appointment at Tazewell Pike Animal Clinic on April 20 at 9:00 a.m. The defendant had confirmed that appointment with the veterinarian's office the day before, on April

---

[2] In accordance with Fed. R. Crim. P. 49.1, the Replogles' home address has been redacted from the text block appearing above.

3

19. Other than the staff at Tazewell Pike Animal Clinic, Nelson and Ann Replogle were the only two persons who would have known about the appointment.

Coinbase informed the FBI investigators that the Bitcoin purchases had been made with funds from a First Horizon Bank savings account held in the name of "Replogle/N." The FBI obtained a summary of the defendant's banking activity for the preceding weeks, and found that from April 1 through April 14, he had withdrawn and transferred $17,929 from his personal bank account to Coinbase and that he had done so in six separate transactions:

| Date | Amount | Description | |
|---|---|---|---|
| 04/01 | $1,000.00 | WITHDRAWAL -COINBASE.COM 8889087930 DQVYJSUVCE8E | 0000 |
| 04/02 | $929.00 | WITHDRAWAL -COINBASE.COM 8889087930 W9WPTBRMCE8E | 0000 |
| 04/02 | $1,000.00 | WITHDRAWAL -COINBASE.COM 8889087930 CXJWCBGFCE8E | 0000 |
| 04/09 | $7,500.00 | WIRE OUT 210409001366 COINBASE INC | 0000 |
| 04/09 | $1,000.00 | WITHDRAWAL -Coinbase.com YCPDJHWH YCPDJHWHce8e | 0000 |
| 04/09 | $25.00 | WIRE TRANSFER FEE | 0000 |
| 04/14 | $6,500.00 | WIRE OUT 210414001518 COINBASE INC | 0000 |
| 04/14 | $25.00 | WIRE TRANSFER FEE | 0000 |
| 04/30 | $0.07 | INTEREST EARNED | 0000 |

At the time of transfer, the $17,929 wired to Coinbase was roughly equivalent to 0.1425 Bitcoin – the agreed-upon price for Ann's murder.

## 2. The Psychological Assessment

Seeking to mitigate his culpability for attempting to have his wife murdered, the defendant suggested that his out-of-character behavior was the result of his having suffered COVID-19 near the end of 2020. He claimed that the disease had caused him to experience serious cognitive changes.

In May, 2021, at the request of defense counsel, forensic psychologist Kathryn Smith, Ph.D., conducted a psychological assessment of the defendant.[3] In addition to interviewing the defendant, Dr. Smith also spoke with the defendant's wife. Dr. Smith's found that the defendant was experiencing symptoms of Severe Major Depression, along with symptoms of Hypomania. She further noted that Major Depression, in concert with Hypomania, is characteristic of Bipolar II Disorder. As for the etiology of the defendant's psychological condition, Dr. Smith offered two hypotheses. The first was that the worsening mood symptoms, particularly the new onset of Hypomania, could be the result of COVID-related inflammation of the brain. The second was that the defendant's narrow avoidance of death from COVID caused the manifestation of psychological conflicts related to mortality concerns, the stress of which triggered the onset of Bipolar Disorder. *See* Smith Evaluation at 9-10.

The defendant did, in fact, contract COVID-19 in November, 2020. He endured a moderately lengthy period of illness, of either 15 days (according to the

---

[3] Kathryn R. Smith, Ph.D., ABPP, Forensic Psychological Evaluation Report (hereinafter, "Smith Evaluation"), dated May 24, 2021, submitted under seal.

defendant) or 18 days (according to his wife). As reported in the Presentence Investigation Report (Docket No. 23) ("PSR"), he sought care at Parkwest Medical Center on the ninth day of his illness, but he was not admitted to the hospital. PSR at ¶ 36. He reported to Dr. Smith that it took a month for him to recover his stamina after the bout with COVID.

The defendant's wife told Dr. Smith that there were major changes in her husband's lifestyle after he recovered from COVID. He bought snakeskin cowboy boots, a belt, buckle, and hat, and began listening to old country songs, which he played over and over. He walked around the house a great deal, always wearing headphones, and would go for long walks at night by himself. She noted that the defendant began to worry about his personal appearance, that he began to lift weight and exercise, and that he began taking a new interest in his clothing and hair. He suggested that she get a job and go see her mother. More unnerving for the defendant's wife was that her husband obtained a concealed carry permit and started going to the range. Also, he started showing off, both to friends and strangers, that he was armed. In fact, he started keeping guns and knives on his person and/or around him at all times. In discussing the defendant's psychological condition, Dr. Smith provided a detailed summary of information that had been provided through the interviews of the defendant and his wife. *See* Smith Evaluation at 4.

Although Dr. Smith's psychological assessment of the defendant is informative, her conclusions could only be as good as information that she was given. It appears

6

that certain crucial details were not provided during the interviews that Dr. Smith conducted.

As the FBI continued examining the events surrounding the defendant's actions, investigators found that the defendant had been arranging extramarital trysts as early as October 2020 (*i.e.*, the month *before* he came down with COVID). Prior to becoming ill, the defendant had signed up with Ashley Madison, a website that is notorious for promoting adulterous affairs. He had also begun using a messaging application on OurTime.com, a dating site that caters to singles who are older than 50 years of age.

The FBI found that the defendant, using the moniker "Carl James," had begun chatting online with a woman named Kendell Storm ("Storm") in October 2020. They broke off communications when Storm began a relationship with someone else. In January 2021, however – after the defendant's bout with COVID was over – he started messaging Storm again. Their communications left the OurTime.com platform and transitioned to emails, texts through Google Voice, and some phone calls through Google Voice. "Carl James" revealed to Storm that his "real name" was Chris James, and they decided to meet in person. They met for the first time on February 2, 2021, in Cookeville, Tennessee, then again in the same city in the middle of February. Their third and last meeting occurred on February 20-21, 2021, when they spent the night together in a hotel in Nashville.

7

Storm broke off communication with "James" around the beginning of March 2021 by telling him that she had begun a committed relationship. The defendant was not inclined to let her go. On March 8, 2021, he sent her a handwritten letter saying that he knew her home address. Subsequently, she received a second letter with five songs that the defendant had written about her. The letter also said that the defendant had seen Storm's boyfriend's truck in her driveway (which was not visible from the roadway). The FBI conducted a consensual search of the defendant's computer and found documents pertaining to Storm. No additional information was readily available; after the FBI visit to the Replogles' residence on April 20, the defendant had busied himself shredding documents in his home office.

On April 22, 2021, the defendant's wife contacted the FBI to inform investigators of some unusual charges on her husband's credit card bill. The charges included two dating websites described above, Ashley Madison and OurTime.com; both charges were incurred on March 18, 2021. She also found three charges for the hotel "Courtyard by Marriott" on February 23, April 5, and April 20, 2021, and a February 22, 2021 for "Hampton Inn – Dupont Rd." Finally, she saw that her husband had purchased services from NordVPN, a virtual private network services provider, which would provide for surreptitious communication.

From the information uncovered by the FBI, at least two viable motives emerged for the defendant's wanting his wife dead. First, she had a $100,000 life insurance policy, for which the defendant was the sole beneficiary. Second, it appears

8

that the defendant wished to eliminate any impediment to his engagement in relations with persons other than his wife. As he related to the FBI when asked whether anyone would want to kill his wife, the defendant replied that there was no reason that anyone would, since "all she does is sit around and knit all day."

## ANALYSIS

### 1. Legal Standard

Title 18, United States Code, Section 3553(a) sets forth the factors that a Court should consider in imposing a sentence. In determining the appropriate sentence, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A sentence within the applicable Guideline range is presumed reasonable. A court is permitted to vary downward or upward from the Guideline range, however, and a sentence outside the applicable range is not presumptively unreasonable. *United States v. Ushery*, 785 F.3d 210, 223 (6th Cir. 2015).

### *2. A Guideline sentence would be consistent with 18 U.S.C. § 3553.*

A Guideline sentence would be sufficient, but not greater than necessary, to comply with the sentencing factors set forth in 18 U.S.C. § 3553. Such a sentence would promote respect for the law, provide just punishment to the defendant and would recognize the seriousness of his offenses. In addition, a sentence within the applicable Guideline range would be consistent with the need to provide adequate deterrence. In the context of section 3553, deterrence takes two forms - specific deterrence, which seeks to deter future conduct by the recipient of the sentence, and general deterrence, which is intended to deter future offenders who might contemplate committing similar offenses. Given the furtive nature of the defendant's efforts to rid himself of his wife, and his attempts to hide the evidence of his actions, there is a need for specific deterrence. In addition, the sentence imposed should be sufficiently severe to deter other would-be offenders.

In determining an appropriate sentence, section 3553 also directs the Court to consider the "history and characteristics of the defendant," and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(d). In light of Replogle's age and work history, it is unlikely that he would benefit from educational or vocational training. Given his psychological condition, however, it does appear that he would benefit from the mental health treatment that is provided by the Bureau of Prisons.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the defendant, Nelson Paul Replogle, receive a sentence within the applicable Guideline range of 87 to 108 months.

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

By: *s/ Frank M. Dale, Jr.*
Frank M. Dale, Jr.
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee 37902
(865) 545-4167
frank.dale@usdoj.gov
D.C. Bar # 454048